Filed 11/18/15  P. v. Koonce CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID KOONCE,<br><br>    Defendant and Respondent. | F068465<br><br>(Tulare Super. Ct. No. VCF284140)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Julia Freis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant was convicted of felony vandalism, assault with a deadly weapon, and criminal threats after he used a hatchet to smash the windows on a car, went to a nearby

apartment, and used the same hatchet to assault and threaten to kill a woman. He was sentenced to a term of eight years.

On appeal, defendant contends the court erroneously permitted an officer to testify about the hearsay statements of two witnesses, Maria Aldana and Lee Paxton, about the incident at the apartment. Defendant argues their hearsay statements were admitted in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) because Aldana never appeared at trial and her statements were testimonial, and Paxton claimed he could not remember anything about the incident. Defendant also argues there is insufficient evidence to support his convictions because the prosecution relied on the testimony of these same two witnesses. He further contends the prosecutor committed prejudicial misconduct in closing argument. We affirm.

## FACTS

### Vandalism of Montoya's Car

On June 7, 2013, at approximately 4:51 a.m., Reynaldo Montoya (Montoya) was working in his office at H&R Block, located in the Big 5 shopping center on Mooney Boulevard in Visalia. Montoya was the only person in the office, and his Toyota was parked in front of the door. He heard someone knock at the locked office door, and he went to the window.

Montoya later identified defendant as the person at the door. Montoya testified that defendant said, " 'Let me in.' " Montoya waived off defendant and said the office was closed. Defendant repeated, " 'You know me, you know me,' " and his tone of voice was rising. Montoya had never seen defendant before, did not know him, and refused to unlock the door.

Montoya returned to his desk. He heard a thud outside and realized defendant had kicked his car. Montoya looked outside and saw defendant walking toward the street. Defendant went to a shopping cart, reached in, and pulled something out. Montoya thought it looked like a stick.

2.

Montoya testified defendant walked directly back to his car. Montoya left the window and called 911. As he was talking to the operator, he heard glass breaking. He looked outside and saw defendant swinging some type of "stick," and smashing nearly all the windows on his car. Montoya was afraid defendant would try to get into the office, so he stepped away from the window so defendant would not see him.[1]

After Montoya spoke to the 911 operator, he again looked out the window and saw defendant walk toward the shopping cart and Mooney Boulevard.

William Huott (Huott) was driving by the Big 5 shopping center parking lot and heard huge thumping sounds and broken glass. He saw someone standing by a car in the parking lot. No one else was around and Huott thought it was unusual. He pulled into the parking lot to see what was going on. Defendant walked toward Huott's truck. He was holding a hatchet. Defendant told Huott: " 'You need to get the hell out of here.' " Huott immediately agreed that he should leave. He tried to put his truck into reverse but it stalled. He started the truck again and drove away. Huott stopped at a convenience store and called 911.

**Response to the Vandalism Dispatch**

At approximately 4:51 a.m., Visalia Police Officer Bernado Villegas received a dispatch that a man with a weapon smashed the windows on a car; he was walking down Mooney Boulevard; and he had a red shopping cart.

Officer Villegas responded to the scene within three minutes. He did not see anyone in the Big 5 parking lot, where Montoya's office and car were located. Villegas turned at the corner of Princeton Street and saw a red shopping cart, but no one was near it. He looked across the street and saw defendant breaking a window in an apartment building. Defendant was hitting the window with a small hatchet or axe. Villegas did not

---

[1] Montoya testified that he paid $5,100 to an automotive business to repair the damage to his car, which included the front and back windshields, all the side windows, the front headlights, and the side view mirrors.

3.

see or hear anyone from the apartment, and he did not see defendant enter or leave the apartment interior.

Officer Villegas testified that defendant saw him, and walked toward him. He was still holding the hatchet. Villegas, who had stepped out of his patrol car, drew his service weapon and repeatedly ordered defendant to drop the hatchet. Defendant ignored his commands. Defendant held onto the hatchet and walked toward the shopping cart. Additional officers arrived and defendant was again ordered to drop the hatchet. He finally tossed away the hatchet and complied with the officers' instructions to get on the ground. He was taken into custody without further incident.

**The Witnesses at the Apartment**

Officer Leah Klascius also heard the dispatch about the man smashing car windows. She was on patrol in the same area and reached the scene within two or three minutes. She turned onto Princeton and saw Officer Villegas draw his gun on a man, later identified as defendant. She was about to assist Villegas when she saw Officer Young arrive. Villegas and Young appeared to have the situation under control, and defendant was prone on the ground.

Officer Klascius testified she saw a woman across the street from the location where the officers were with defendant. The woman was waving her hands to flag down an officer. The woman was crying and appeared "really shaken up."

Officer Klascius contacted the woman, who was identified as Maria Aldana (Aldana). Aldana was standing outside an apartment complex on Princeton, which was around the corner and a couple of hundred yards away from the Big 5 shopping center parking lot on Mooney Boulevard. Officer Klascius testified the apartment's front door was open, the large window next to the front door was broken, and broken glass was on the ground below the window.

Officer Klascius testified Aldana was "visibly upset" and her "hands were shaking a little bit, she was crying." Aldana "basically yelled out that she hoped we were

4.

arresting [defendant] because she was afraid for her life."[2] Klascius told Aldana that "it appeared that he was being arrested or at least being detained because they were picking him up off the ground in handcuffs, but I didn't know what for at that point because we hadn't made any victim contact with anybody yet."

Officer Klascius testified Aldana said defendant "tried to kill her with a hatchet." Aldana spoke in a "raised tone of voice, not quite yelling but very fast rapid speech, very excited." Aldana made these statements before Klascius asked her any questions. "[S]he was just really shaken up and I think her statement about him trying to kill her with a hatchet was in my response because I told her I didn't know what he was in custody for at that point and I think she might have been a little bit upset I didn't promise her he was going to jail at that point."

As Officer Klascius spoke to Aldana, a man later identified as Lee Paxton (Paxton) walked out of the apartment. Klascius testified Paxton was shaken up, and he was "a little bit kind of freaked out … a little bit excited" under the circumstances.

Officer Klascius asked Paxton what happened. Paxton said he had been asleep on the couch in the apartment.[3] He woke up because a man was inside, and the man "was holding a hatchet over his head as if he was going to hit Ms. Aldana with it." Paxton said the man was yelling at Aldana "to give him the money back or he was going to kill her."

---

[2] As we will discuss in issue II, *post*, the prosecution was unable to locate Aldana for trial. The court overruled defense objections and permitted Officer Klascius to testify about Aldana's hearsay statements pursuant to the spontaneous declaration exception to the hearsay rule (Evid. Code, § 1240).

[3] As we will discuss in issue I, *post*, Paxton appeared as a prosecution witness but testified that he did not remember anything about the incident, speaking to the officer, or what he said to the officer. The court overruled defense objections and permitted Officer Klascius to testify about Paxton's statements at the scene under the hearsay exception of prior inconsistent statements (Evid. Code, § 1235), and found that Paxton was being deliberately evasive and feigning memory loss.

Paxton said he got up from the couch and started yelling at the man. The man turned toward Paxton "and held up the hatchet at him."

Paxton pointed toward where the officers were with defendant across the street, and said defendant was the man with the hatchet. Aldana and Paxton said they were staying at the apartment, and it was not their residence. Aldana said she just crashed there. No one else was in the house. Neither Paxton nor Aldana admitted it was a place to use drugs. Officer Klascius believed it was "a party house" because there was not much furniture; there were some bedroom things and beer cans around the apartment.

Officer Klascius testified both Paxton and Aldana appeared shaken and "somewhat panicked." Aldana was excited but not agitated. Klascius did not evaluate them to determine if they were under the influence. She did not search the house for drugs.

**Charges, Verdict, and Sentence**

Defendant was charged and convicted of count I, making criminal threats to Aldana (Pen. Code, § 422),[4] with the special allegation that he personally used a deadly weapon, a hatchet (§ 12022, subd. (b)(1)); count II, assault with a deadly weapon, a hatchet, on Aldana (§ 245, subd. (a)(1)); and count IV, felony vandalism causing over $400 damage to Montoya's car (§ 594, subd. (a)).

Defendant was also charged with count III, assault with a deadly weapon, a hatchet, on Paxton. The jury found him not guilty of this charge.

The court found the prior conviction allegations true, that he had one prior strike conviction and one prior serious felony enhancement.

At the sentencing hearing, the court granted defendant's request and dismissed defendant's prior strike conviction. Defendant was sentenced to the aggregate term of eight years: the middle term of three years for count II; plus five years for the prior

---

[4] All further statutory citations are to the Penal Code unless otherwise indicated.

serious felony enhancement (§ 667, subd. (a)(1)); and concurrent terms for counts I and IV, and the firearm allegation.

## DISCUSSION

## I.   ADMISSION OF PAXTON'S STATEMENTS

Paxton appeared as a prosecution witness but insisted he did not know anything about this case, why he was called, whether he spoke to the police, or anything about defendant's actions in the apartment. The court granted the prosecutor's motion for Officer Klascius to testify about Paxton's hearsay statements made at the scene. The court found Paxton's statements were admissible for the truth of the matter under the hearsay exception of prior inconsistent statements pursuant to Evidence Code section 1235, and that Paxton's claims that he could not remember were not credible.

Defendant asserts the court erroneously admitted Paxton's hearsay statements through Officer Klascius's trial testimony. Defendant argues that the prosecutor intentionally set up a situation where Paxton would claim he did not remember anything, so he could introduce Paxton's hearsay statements in violation of defendant's due process rights.

Defendant has not directly challenged the court's ruling that Officer Klascius's testimony about Paxton's statements was admissible as prior inconsistent statements. Nevertheless, we will review the circumstances which led to the court's decision to admit Klascius's testimony, and find the court did not abuse its discretion to admit the evidence and defendant's due process rights were not violated.

### A.  *Paxton's Initial Appearance*

At the time of defendant's trial, Paxton was in custody on another matter. The prosecutor called Paxton as a witness outside the jury's presence. Paxton initially refused to leave his jail cell and appear in court. The court appointed an attorney to represent Paxton. The court, the parties, and Paxton's attorney discussed the situation off the record. After about 20 minutes, Paxton finally agreed to enter the courtroom.

7.

Once Paxton appeared, the court acknowledged Paxton was reluctant to testify or even enter the courtroom. Paxton said he did not know anything about the case. The court stated it had already appointed an attorney to represent Paxton, who advised him about his obligations to testify under subpoena and his potential Fifth Amendment right not to testify.

Paxton's attorney stated that he discussed the matter with Paxton, and asked if anything about his testimony required him to claim his Fifth Amendment privilege not to testify. Paxton said no. His attorney advised the court that Paxton would not claim a Fifth Amendment privilege not to testify.

The court asked Paxton if he would testify. Paxton said he did not know anything about the case, and he could not recall anything because of his long history of drug and alcohol abuse. The court advised Paxton that he could not refuse to testify and would be held in contempt. Paxton said he would testify.

### B. Paxton's Trial Testimony

The jury returned and Paxton was sworn as a witness. The court advised the jury that it could not speculate why Paxton was in custody and physically restrained.

In response to the prosecutor's questions, Paxton testified he knew Aldana, and he occasionally stayed at her apartment on Central Avenue. He was shown photographs of the apartment at issue in this case, which was located on Princeton. Paxton said that was not Aldana's apartment, and it belonged to "Sandy and Doug." Paxton testified a lot of people went to that apartment, but he had never stayed there with Aldana. Paxton conceded the apartment was a "crash pad" where people went to drink and use drugs.

Paxton testified he did not remember the police responding to the Princeton apartment or defendant being there. Paxton said he knew defendant "in passing" from seeing him on the streets because they were both homeless. Paxton testified he never saw defendant in the apartment or threatening anyone with a hatchet. He was shown a photograph of the hatchet used by defendant, and testified he had never seen it before.

8.

Paxton testified he did not know anything about a window being broken in the apartment, and he did not remember speaking to any officer about such an incident.

The prosecutor asked Paxton about each statement he allegedly made to Officer Kascius—that he was on the couch, that he heard glass breaking, that he saw a man yelling at Aldana, that the man said he would kill her if she did not return his money, and that the man brandished a hatchet at Aldana and himself. Paxton testified he did not "remember having any conversation whatsoever with this officer."

Paxton admitted he was convicted of felony theft offenses in 2008 and 2011. He was on community supervised release, and he was in custody for a parole violation.

> "Q. Is the fact that you are in custody make you reluctant to be here testifying today? [¶] … [¶]
>
> "Q. So it doesn't, you didn't just refuse to leave your jail cell?
>
> "A. Because I don't know anything about this case is why I refused to come here. I don't know anything. I don't even know what I am here for. I thought I was coming for my own personal case so I could be released and go home today."

On cross-examination, Paxton again testified he did not know why he was called to testify.

> "Q. And again, you don't have any recollection of the incident that [the prosecutor] was trying to elicit?
>
> "A. I have no idea.
>
> "Q. No idea. And I don't want to be demeaning to you but it is because of your drug and alcohol use that your memory has lapsed?
>
> "A. I would say so, yes."

### C. Motion to Admit Paxton's Statements

Officer Klascius testified after Paxton, and the prosecutor started to ask her about Paxton's statements at the scene. Defense counsel objected, and the court held a hearing outside the jury's presence.

The prosecutor argued Paxton's claimed memory loss was deliberate and it was not genuine. It happened "immediately after he refused to even get out of the cell before he says that he doesn't want to testify, period. I mean multiple comments of that nature came before his saying I don't remember." The prosecutor noted that when Paxton appeared in the courtroom outside the jury's presence, he was "partially crying" as the court admonished him that he had to testify.

Defense counsel replied the prosecutor's claim was just supposition, and Paxton was being honest when he said he had memory lapses from his severe drug and alcohol problems. Counsel believed Paxton was being forthright, and he never made any inconsistent statement except to say that he could not remember anything.

The court held the prosecutor could ask Officer Klascius about Paxton's statements at the scene.

> "I agree with [defense counsel] in that Mr. Paxton may in fact have a drug history and it may which is just supposition from time to time effect his ability to remember. It was absolutely clear to me that Mr. Paxton's statements that he doesn't remember anything were related to his anxiety and/or fear and/or refusal to initially testify.
>
> "It took over 20 minutes with discussion with security, with Mr. Paxton's lawyer, with the court's direct direction to even get Mr. Paxton out of his cell. *He ... made the mention that he believed he saw some type of writing in the cell that was directed to him which caused him to be reluctant to testify.* There is no question in my mind that he started telling me he didn't remember quote nothing, end quote in response to my directed that he had to testify.
>
> "Under the totality of the circumstances I am going to deny the objection and allow [the prosecutor] to continue with your questioning of this witness."

### D. Motion for New Trial

After defendant was convicted, he filed a motion for new trial, partially based on the court's decision to admit Paxton's hearsay statements to Officer Klascius. Defendant

again argued that Paxton did not make inconsistent statements during his trial testimony, that his long term drug and alcohol use affected his ability to remember.

The court denied defendant's motion for new trial and made extensive findings on the admissibility of Paxton's statements:

> "I need to comment upon my personal observation of Mr. Paxton.… I believe Mr. Paxton clearly did not want to testify. I believe he clearly was saying, I don't know, I don't remember clearly and I have reason to believe by my own observation of him in open court that that was his answer of choice as opposed to a genuine answer and to the extent that I need to make that finding to characterize his previous statement as being inconsistent I believe it is true .…
>
> "I think under the totality of the circumstances his continued statement that I don't remember anything was clearly consistent with his extreme reluctance to testify, and that is just putting it lightly."

### E. Prior Inconsistent Statements

We begin with the court's decision to admit Paxton's hearsay statements as prior inconsistent statements. "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." (Evid. Code, § 1235.) "Prior inconsistent statements are admissible under this provision to prove their substance as well as to impeach the declarant. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Evidence Code section 770 requires that, prior to an inconsistent statement being admitted, the witness be given an opportunity to explain or deny the statement, or that the witness be subject to being recalled as a witness. " 'The "fundamental requirement" of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 462, italics in original.)

11.

"The inconsistency may either be express or implied, and will be deemed implied where the court finds a witness falsely claiming failure to remember facts in order to deliberately avoid testifying as to those facts.  [Citations.]"  (*People v. Rios* (1985) 163 Cal.App.3d 852, 863–864.)  "Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event.  [Citation.]  However, courts do not apply this rule mechanically.  'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.'  [Citation.]  When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.  [Citation.]  As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper.  [Citation.]"  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219; *People v. Coffman* (2004) 34 Cal.4th 1, 78; *People v. Ledesma* (2006) 39 Cal.4th 641, 710–711.)  "[A] trial witness's deliberately evasive forgetfulness is an implied denial of prior statements, which creates 'inconsistency in effect' and authorizes admission of the witness's prior statements under Evidence Code section 1235…."  (*People v. Perez* (2000) 82 Cal.App.4th 760, 764.)

We review the trial court's evidentiary ruling for an abuse of discretion.  (*People v. Jones* (2013) 57 Cal.4th 899, 956.)  The court's credibility determinations are reviewed under the substantial evidence standard.  (*People v. Price* (1991) 1 Cal.4th 324, 413.)

### 1. Analysis

The court did not abuse its discretion when it permitted Officer Klascius to testify about Paxton's hearsay statements.  There is clearly substantial evidence to support the court's factual finding that Paxton's claimed memory loss was feigned and amounted to deliberate evasion.  The court had the opportunity to observe Paxton's demeanor, and consider Paxton's assertion that he could not remember anything because of his drug and alcohol problem.  As the court explained, however, Paxton refused to even leave his cell

12.

for 20 minutes and declared "he saw some type of writing in the cell that was directed to him which caused him to be reluctant to testify." He started to cry, and he did not claim loss of memory until the court advised him that he had to testify. Moreover, Paxton vacillated between his claim of complete memory loss about anything involving the Princeton apartment, defendant, and the hatchet, and his recollection about other details—that the apartment belonged to "Sandy and Doug," that he had stayed there, that he had never been there with Aldana, and that he never saw defendant there. (See, e.g., *People v. Ervin* (2000) 22 Cal.4th 48, 84.)

In light of the entire record, the court's finding that Paxton was being deliberately evasive is supported by substantial evidence, and his prior statements to Officer Klascius were admissible for the truth of the matter under Evidence Code section 1235.

### F. Crawford

On appeal, defendant raises an argument that he did not make during trial or in his motion for new trial. Defendant asserts the admission of Officer Klascius's testimony about Paxton's statements violated his Sixth Amendment right to confront and cross-examine witnesses as set forth in *Crawford*, *supra*, 541 U.S. 36. Defendant argues the prosecutor committed misconduct by calling Paxton as a witness based on the following scenario: The prosecutor knew Paxton did not want to testify and would claim he did not remember anything about the incident, the prosecutor insisted on calling Paxton in the jury's presence "so he could lie about his memory of the incident. [The prosecutor] then used the presentation of this false testimony that it knowingly presented to support introduction of the witness['] out of court statements."

Defendant contends that the prosecutor "essentially did an end run around *Crawford*, setting up a situation where [defendant] had no ability to challenge" Paxton's testimony on cross-examination by calling Officer Klascius to testify to his hearsay statements. The prosecutor "thus benefited from its misconduct in not only getting evidence before the jury that it would not otherwise get, but in getting evidence before

the jury that was not subject to cross examination. This strategy resulted in a fundamentally unfair trial."

Defendant's assertions are spurious and refuted by the record. First, the prosecutor did not commit misconduct by placing Paxton under subpoena to testify. The prosecutor obviously had access to the police reports about Paxton's involvement in the case: He told the officers that he saw defendant raise the hatchet over Aldana's head and threaten to kill her, and defendant briefly brandished the hatchet at him. Paxton was a percipient witness to two counts which defendant allegedly committed against Aldana, and he was a victim of one of the charged offenses.

Second, the court was also aware of Paxton's reluctance to testify and took the appropriate steps to ensure his rights were preserved. The court appointed independent counsel to represent Paxton and advise him of his constitutional right not to incriminate himself. Paxton thus had the opportunity to claim a privilege not to testify and incriminate himself, and he would not have been called as a witness in front of the jury. Paxton met with his attorney, discussed the matter, and the attorney advised the court that Paxton would not claim any Fifth Amendment privilege. The court then advised Paxton he was still under subpoena and could be held in contempt if he refused to testify. The court did not engage in any misconduct in doing so.

Third, defendant's appellate argument is based on the claim that he was denied the right to confront and cross-examine a witness because Officer Klascius testified about Paxton's hearsay statements. However, Paxton appeared at trial, testified under oath, and was subject to cross-examination by defense counsel. Paxton did not refuse to answer any questions, remembered details about the apartment, and repeatedly said he did not remember anything about this incident. Klascius was also subject to extensive cross-examination about Paxton's statements and demeanor, whether the apartment was a "crash pad" for drug and alcohol users, and whether Paxton might have been under the influence at the time.

14.

Finally, and most importantly, *Crawford's* confrontation clause concerns are inapplicable to the hearsay exception of prior inconsistent statement since the witness must first testify and be available for cross-examination, even if the witness claims loss of memory or the court finds the witness has feigned memory loss. (See, e.g., *United States v. Owens* (1988) 484 U.S. 554, 559–560; *People v. Cowan*, *supra*, 50 Cal.4th at p. 468; *People v. Gunder* (2007) 151 Cal.App.4th 412, 419–420.) "The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility. '[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination ... the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements.' [Citation.] In the face of an asserted loss of memory, these protections 'will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.' [Citation.]" (*People v. Gunder*, *supra*, at p. 420.)

Defendant's assertions of alleged prosecutorial misconduct by calling Paxton and doing "an end run around *Crawford*" are not legally or factually supported.

## II. ADMISSION OF ALDANA'S STATEMENTS

The prosecution could not locate Aldana for trial, and the court granted its motion to introduce her hearsay statements to Officer Klascius for the truth of the matter pursuant to the spontaneous declaration exception to the hearsay rule. Defendant contends the court's ruling was erroneous, and Aldana's statements were not spontaneous or made under the stress or excitement of the event. Defendant further argues the court violated his Sixth Amendment right to confront and cross-examine witnesses because Aldana's hearsay statement was testimonial and it should have been excluded under *Crawford*.

15.

As with Paxton's statements, we will review the procedural circumstances which resulted in the admission of Aldana's statements to Officer Klascius.

### A. Motion to Admit Aldana's Testimony

After the court held Paxton's statements were admissible, it conducted another hearing outside the jury's presence on the prosecutor's motion to have Officer Klascius testify about Aldana's statements at the scene. The prosecutor stated that his office had repeatedly tried to find Aldana, but it was unable to locate her. The investigator tried again the previous night and thought there was a new lead, but was again unable to find her. The prosecutor argued Aldana's hearsay statements to Officer Klascius at the scene were admissible as excited utterances.[5]

As an offer of proof for the hearsay exception, the prosecutor stated Officer Klascius arrived at the apartment within a minute after the initial dispatch. Aldana was outside; Klascius was the first officer to whom she spoke; and Aldana was crying and upset. Aldana volunteered statements about the incident, said she was afraid for her life, screamed that defendant attempted to kill her with a hatchet, and she wanted him arrested.

Defense counsel replied that Officer Klascius's hearsay testimony was inadmissible under *Crawford* because Aldana was not available for cross-examination, and Aldana's statements were not close in time to the incident to be reliable. Counsel argued both Aldana and Paxton were likely drug addicts and not reliable. He also doubted the prosecutor's attempts to find Aldana were sufficient because he knew she was a transient, and the case had been going on for three months.

---

[5] Both the court and the parties analyzed the admissibility of Aldana's statements pursuant to the elements of the spontaneous declaration exception to the hearsay rule, as contained in Evidence Code section 1240, but they also referred to the hearsay evidence as "excited utterances," using the phrase for the federal hearsay counterpart (Fed. Rules Evid., rule 803(2)).

The court held Aldana's hearsay statements to Officer Klascius were admissible as excited utterances. It also found the prosecutor had made good faith efforts to find Aldana, which it felt was important regarding defendant's due process arguments. However, the court advised defense counsel that he could argue to the jury that it should disregard her statements because he did not have the opportunity to cross-examine her.

As set forth above, Office Klascius testified about Aldana's statements at the scene, her description of defendant assaulting and threatening her with the hatchet, and her identification of defendant as he was being arrested across the street.

### B. *Motion for New Trial*

Defendant's motion for new trial was also based on the court's decision to admit Aldana's hearsay statements to Officer Klascius. Defendant argued Aldana's statements were not excited utterances; the statements were made an unknown length of time after the incident; and Aldana had the time to reflect and the motive to deliberately fabricate because "she apparently had stolen money" from defendant. Defendant further argued Aldana's statements were the product of police interrogation and were testimonial, and the evidence should have been excluded under *Crawford* because Aldana was not subject to cross-examination.

The court again found that Aldana's statements were properly admitted as spontaneous declarations because they were made to the responding officer. The officer did not ask any questions, Aldana was visibly upset and crying, and Aldana spontaneously made the statements without being asked anything. The court rejected defendant's claim that Aldana had time to reflect before she made the statements. "I believe that they were made when she was obviously upset."

The court also noted that Aldana's failure to appear was "not the result of any engineering by the People, it was not done because of any negligence by the People and it was not done so that they could try to keep her away from any type of vigorous confrontation or cross-examination. They just were not able to locate her, despite their

17.

attempts to do so."  The court acknowledged the important constitutional right to cross-examine a witness, but it found Aldana's statements were not testimonial and were admissible under *Crawford*.

### C.  Spontaneous Declarations

"A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and "[w]as made spontaneously while the declarant was under the stress of excitement caused by" witnessing the event.  (Evid. Code, § 1240.)

" 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318; *People v. Gutierrez* (2009) 45 Cal.4th 789, 809–810.)  Whether a witness is unavailable is not an element of a spontaneous declaration.  (Evid. Code, § 1240; *People v. Dennis* (1998) 17 Cal.4th 468, 529; *White v. Ill.* (1992) 502 U.S. 346, 355, fn. 8.)

The word "spontaneous" as used in Evidence Code section 1240 means "actions undertaken without deliberation or reflection....  [T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903, overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

"The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker.  The nature of the utterance—how long it

18.

was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. [Citations.] More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. [Citations.] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. [Citation.]" (*People v. Farmer*, *supra*, 47 Cal.3d 888, 903–904; *People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 810–811.)

" 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*.' [Citation.] [¶] Under the same reasoning, the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity. [Citations.] To conclude otherwise would render the exception virtually nugatory: practically the only 'statements' able to qualify would be sounds devoid of meaning." (*People v. Poggi*, *supra*, 45 Cal.3d at p. 319, italics added in original.)

For example, in *People v. Morrison* (2004) 34 Cal.4th 698, the first officer to arrive at the scene of a shooting observed the victim of gunshot wounds being comforted by another male. The officer asked, "[W]ho did it[?]" The victim responded by naming three specific individuals. *Morrison* held the answer to a simple inquiry may be spontaneous, and the victim's spontaneous statement of names as to " 'who did it' described the event she perceived" and "courts have found or recognized that statements purporting to name or otherwise identify the perpetrator of a crime may be admissible where the declarant was the victim of the crime and made the identifying remarks while

19.

under the stress of excitement caused by experiencing the crime. [Citations.]" (*Id.* at pp. 718–719.)

In *People v. Brown* (2003) 31 Cal.4th 518, the court similarly held a statement was properly admitted as spontaneous under Evidence Code section 1240, even though made two and one-half hours after the shooting. The witness was still crying and trembling at the time he expressed his belief that the defendant had shot and seriously injured the victim. (*Id.* at p. 541.)

The trial court's determination of the preliminary facts, such as whether the declarant was under the stress of excitement when the statements were made, will be upheld if supported by substantial evidence. The court's ultimate decision to admit the evidence is reviewed for abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 235–236; *People v. Brown*, *supra*, 31 Cal.4th at pp. 540–541.)

### 1. Analysis

Defendant concedes Aldana's statements were not made in response to questions posed by Officer Klascius. However, he asserts her hearsay statements were not admissible as spontaneous declarations because there was no evidence when the purported incident with Aldana occurred, if there was time for her to contrive or misrepresent, and if she was crying and upset because she was under the influence or for some other reason. Defendant contends there is no evidence when the apartment incident occurred and none of the officers saw defendant walk in or out of the apartment. Defendant believes the apartment incident occurred before he vandalized Montoya's car, so that Aldana's statements were not made under the stress of the excitement of the event.

We find the court did not abuse its discretion and substantial evidence supports its factual findings that Aldana's statement was made immediately after the startling event of defendant attacking her with a hatchet and while she was under the stress of nervous excitement from that assault. The initial dispatch about defendant smashing Montoya's car windows was sent out at approximately 4:51 a.m., presumably in response to the 911

20.

call made by Montoya as defendant was in the process of smashing the windows. Officer Villegas was the first person to respond and arrived at the scene within three minutes. He did not see defendant in the parking lot. Aldana and Paxton described a sudden, brief incident of defendant entering the apartment, brandishing the hatchet, and threatening to kill Aldana. Officer Villegas turned on Princeton, and saw defendant smashing the apartment window with the hatchet. This sequence establishes that defendant initially confronted Montoya, smashed his car windows, confronted Huott, and then walked to the nearby apartment where he confronted Aldana and Paxton with the hatchet. Villegas and other officers took defendant into custody across from the apartment.

Officer Klascius testified she responded to the same dispatch, arrived in the area, and saw the other officers taking defendant into custody. She also saw Aldana at the apartment across the street from defendant's location, trying to flag down an officer. Klascius saw the smashed apartment window and broken glass on the ground. Klascius testified Aldana appeared "really shaken up"; she was "visibly upset" and her "hands were shaking a little bit, she was crying"; and she spontaneously "yelled out" that she hoped they were arresting defendant "because she was afraid for her life." Klascius did not ask Aldana any questions, but merely advised her that it appeared defendant was being taken into custody, but she did not know the status of the investigation. Aldana spontaneously said defendant tried to kill her with a hatchet, and spoke in a "raised tone of voice, not quite yelling but very fast rapid speech, very excited."

Aldana's statements to Officer Klascius were made within minutes of defendant entering the apartment, raising the hatchet over her head, and threatening to kill her. Aldana was visibly upset, crying, and shaking. She was trying to get help to protect herself from the hatchet-wielding assailant, and she did not make the statements in response to questions or any type of police interrogation. Her statements were made under the stress of the incident and were admissible as spontaneous declarations. We would reach the same conclusion even if defendant assaulted and threatened to kill

21.

Aldana before he vandalized Montoya's car. The entire sequence occurred in a short period of time in two adjacent locations. As in *People v. Brown, supra,* 31 Cal.4th at page 541, Aldana was still crying, upset, and under the stress of the excitement when she made the statements to Klascius within minutes of being threatened with a hatchet.

### D. Crawford

Defendant asserts the admission of Aldana's statements violated his confrontation rights under *Crawford* because the statements were testimonial, made to an officer as part of Aldana's desire to have defendant arrested and incarcerated, and Aldana was not subject to cross-examination. As we will explain, however, Aldana's spontaneous declarations were not testimonial under *Crawford*.

"Prior to *Crawford,* the admission of an unavailable witness's statement against a criminal defendant was governed by the well-settled rule of *Ohio v. Roberts* (1980) 448 U.S. 56, 66 …. *Roberts* held such statements could be admitted at trial only when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) the statements contain 'particularized guarantees of trustworthiness' such that adversarial testing would add little to the statements' reliability. [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 171–172, questioned on other grounds in *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1223.) "The hearsay exception for spontaneous declarations is among those 'firmly rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause. [Citation.] The Sixth Amendment confrontation clause imposes no requirement of declarant unavailability as a prerequisite for admission of spontaneous declarations. [Citation.]" (*People v. Dennis*, *supra*, 17 Cal.4th at p. 529; *White v. Ill.*, *supra*, 502 U.S. at p. 355, fn. 8.)

*Crawford* repudiated *Ohio v. Roberts*, *supra*, 448 U.S. 56 and held that the confrontation clause bars admission of "testimonial" hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination of the declarant. (*Crawford*, *supra*, 541 U.S. at pp. 53–54, 59, 68.) Where the proffered

22.

statement is nontestimonial, state law may regulate the admission of evidence by applying statutory hearsay rules without running afoul of the confrontation clause. (*Id.* at p. 68.) After *Crawford,* "nontestimonial" hearsay statements continue to be governed by the *Roberts* standard. (*Id.* at pp. 66–68; *People v. Smith* (2005) 135 Cal.App.4th 914, 924, disagreed with on other grounds in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291.)

*Crawford* did not set forth "a comprehensive definition" of testimonial evidence but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations…." (*Crawford*, *supra*, 541 U.S. at p. 68.) "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)

"The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' [Citation.] Rather, it focuses them on 'end[ing] a threatening situation.' [Citation.]" (*Michigan v. Bryant* (2011) 562 U.S. 344, 361 (*Bryant*).) "The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause…." (*Id*. at p. 361, fn. 8.)

"[I]t is difficult to identify any circumstances under which [an Evidence Code] section 1240 spontaneous statement would be 'testimonial.'  The rationale of the spontaneous statement exception to the hearsay rule is that the utterance must be made without reflection or deliberation due to the stress of excitement.  [Citation.] [S]tatements made without reflection or deliberation are not made in contemplation of their 'testimonial' use in a future trial."  (*People v. Corella* (2004) 122 Cal.App.4th 461, 469 (*Corella*).)

A series of cases illustrates this point and demonstrates that Aldana's statements to Officer Klascius were not testimonial, the admission of the statements did not violate the confrontation clause, and the evidence was admissible as spontaneous declarations.  In *Bryant*, *supra*, 562 U.S. 344, the defendant was convicted of second degree murder.  The police responded to the victim's location and discovered he had been shot in the abdomen.  The victim told officers he had been at the defendant's home and had been shot through the back door.  After being shot, he got in his car and drove to a gas station where officers found him.  The victim later died.  At trial, his statements to the officers were admitted as excited utterances.  (*Id.* at pp. 350–352.)  *Bryant* held the victim's statements to the officers were not testimonial because an objective view of the totality of the circumstances established the primary purpose of the interrogation was to respond to an ongoing emergency.  (*Bryant*, *supra*, 562 U.S. at pp. 368–372, 378.)

> "[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the 'primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.'  [Citation.]"  (*Id*. at p. 374.)

*Bryant* compared the situation to being "more similar, though not identical, to the informal, harried 911 in *Davis* than to the structured, station-house interview in *Crawford*…."  (*Bryant*, *supra*, 562 U.S. at p. 377.)  *Bryant* noted that a formal station-house interview is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial

evidence against an accused. (*Id*. at pp. 366, 377.) When the police arrived, they found the victim lying in a gas station parking lot, bleeding from a mortal gunshot wound. The officers asked the victim what happened. The victim replied that the defendant shot him, explained the circumstances, and kept asking when emergency medical personnel would arrive. "From this description of his condition and report of his statements, we cannot say that a person in [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' [Citation.]" (*Id*. at p. 375.) The officers did not know anything about the circumstances of the shooting or the gunman's location, and their questions "solicited the information necessary to enable them 'to meet an ongoing emergency.' [Citation.]" (*Id*. at p. 376.)

In *People v. Blacksher* (2011) 52 Cal.4th 769 (*Blacksher*), the declarant spoke to an officer at her house, where her daughter and grandson had been fatally shot. The officer arrived within four minutes of the dispatch. The declarant said the gunman was her son. The responding officer spoke with the declarant for approximately 15 minutes. The officer asked questions about the shooting, including questions related to the defendant's current location. The officer learned the defendant was not at the house so the officers presumed the defendant was an armed shooter. The declarant was visibly upset, and the interview occurred in the front yard of her house with a neighbor present, under chaotic conditions. (*Id*. at pp. 816–817.)

*Blacksher* held the declarant's statements were not testimonial under *Crawford* because it was an emergency situation, and an armed perpetrator might still be at large. "Objectively, the primary purpose of both [the declarant] and [the officer] was to deal with that emergency, not to create an out-of-court substitute for trial testimony. Instead, the primary purpose for both of them was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed." (*Blacksher*, *supra*, 52 Cal.4th at p. 816.) The declarant was "greatly upset" throughout her encounter with the officer, the discussion was in an open setting "under chaotic conditions," and it was "much more

25.

similar to the parking lot questioning in *Bryant* than the more calm and formal circumstances of *Crawford ....*" (*Id.* at p. 817.)

In *Corella*, *supra*, 122 Cal.App.4th 461, a domestic violence victim called 911 and reported the defendant had punched and beaten her. The victim made similar statements to the officer who responded to the 911 dispatch. The officer testified the victim was crying, distraught, and in physical pain, and she said the defendant had punched and beaten her after an argument. (*Id.* at pp. 465–467.) *Corella* held the victim's statements to the 911 dispatcher and the responding officer were not testimonial.

> "[W]hen [the officer] arrived at the scene in response to [the woman's] 911 call, [the woman's] spontaneous statements describing what had just happened did not become part of a police interrogation merely because [he] was an officer and obtained information from [her]. *Preliminary questions asked at the scene of a crime shortly after it has occurred do not rise to the level of an 'interrogation.'* Such an unstructured interaction between officer and witness bears no resemblance to a formal or informal police inquiry that is required for a police 'interrogation' as that term is used in *Crawford.* [Citations.]" (*Id.* at p. 469, italics added.)

A similar conclusion was reached in *People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn*), where a stabbing victim made statements about the assault to a 911 operator and the first responding officer. (*Id.* at p. 169.) *Brenn* held all the victim's statements were not testimonial, including those made to the responding officer. "[The officer] had but a few moments with [the victim] before the paramedics arrived, and during this brief period of time he was only able to ask [the victim] a few general questions about what was going on. He was there to assist [the victim], not to prepare for trial.… Because of the informality, brevity and unstructured nature of the exchange between [the victim] and [the officer], we find [the victim's] statements to the officer were nontestimonial." (*Id.* at p. 178; see also *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1479; *People v. Chaney* (2007) 148 Cal.App.4th 772, 775–780.)

### 1. Analysis

Aldana's statements to Officer Klascius were not testimonial. As defendant concedes, Officer Klascius was not conducting a formal investigation, she did not ask Aldana any questions, and she did not even know whether defendant was going to be detained, arrested, or charged with anything. Klascius was responding to the initial dispatch about a man smashing car windows; the officer did not know anything about a man smashing windows in an apartment until Aldana flagged her down to get help. Aldana was crying, upset, and distraught, and spontaneously volunteered that defendant had threatened to kill her with the hatchet. The circumstances of the very brief exchange between Aldana and Klascius "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [Aldana] simply was not acting as a *witness;* she was not *testifying.*" (*Davis, supra,* 547 U.S. at p. 828, italics in original.) While Aldana wanted the officers to arrest defendant, it was based out of her fear that he had just threatened to kill her with a hatchet. It does not appear Aldana's primary purpose was "to establish past facts for use in a criminal trial .... '[T]he proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively,* are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.' [Citation.]" (*Brenn, supra,* 152 Cal.App.4th at p. 177, italics in original.)

Aldana's statements were not testimonial, and the evidence was thus admissible under the statutory rules of evidence as spontaneous declarations.

## III.    SUBSTANTIAL EVIDENCE FOR COUNTS I AND II

Defendant contends his due process rights were violated because there is insufficient evidence to support his conviction in count I, criminal threat (§ 422) and count II, assault with a deadly weapon (§ 245, subd. (a)(1)), both committed against Aldana. Defendant again raises due process challenges to the introduction of the hearsay

statements of Paxton and Aldana to support these convictions. He also challenges the evidence in support of the elements of the two offenses.

### A. Substantial Evidence and Due Process

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Defendant argues counts I and II must be reversed because the hearsay statements of Aldana and Paxton were the only evidence to prove his convictions for assault with a deadly weapon and criminal threat committed against Aldana, and this evidence was vague, thin, and unreliable. Defendant renews the due process arguments he made as to the admission of Officer Klascius's testimony about the statements made by Paxton and Aldana at the scene, Aldana's failure to appear and the defense's inability to cross-examine her, and the circumstances surrounding Paxton's claim of memory loss. Defendant asserts that reliance on their hearsay statements to convict him of both offenses violated his due process rights.

As we have explained in sections I and II, *ante*, however, the court did not abuse its discretion or violate his Sixth Amendment confrontation rights when it permitted Officer Klascius to testify about the statements made by Paxton and Aldana at the scene.

28.

While Aldana could not be found for trial, and she was not subject to cross-examination, her statements were admissible as spontaneous declarations and were not testimonial under *Crawford*. Paxton appeared and was subject to cross-examination, feigned memory loss, his statements at the scene were properly admitted as prior inconsistent statements, and defendant's confrontation rights were not implicated by the court's ruling.

We thus turn to the elements of the offense and determine if defendant's convictions are supported by substantial evidence.

### B. Criminal Threat

In count I, defendant was convicted of making a criminal threat to Aldana in violation of section 422. In order to prove this offense, the prosecution must prove the following elements: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat ... was 'on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

"A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)

29.

While the threat must convey " 'a gravity of purpose and an immediate prospect of execution of the threat,' " section 422 "does not require an immediate ability to carry out the threat. [Citation.]" (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679; *People v. Smith* (2009) 178 Cal.App.4th 475, 480.) " 'The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat,' and such threats must be 'judged in their context.' [Citations.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 807.)

" 'A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]' [Citation.] In determining whether conditional, vague, or ambiguous language constitutes a violation of section 422, the trier of fact may consider 'the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant.' [Citation.]" (*Wilson*, *supra*, 186 Cal.App.4th at pp. 807–808.)

The "sustained fear" element is satisfied "where there is evidence that the victim's fear is more than fleeting, momentary or transitory. [Citation.]" (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190.) Fear may be "sustained," even if it lasts for a relatively brief period of time. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

### 1. Analysis

Defendant argues his conviction for making a criminal threat to Aldana must be reversed there is insufficient evidence about "the circumstances surrounding the incident" to prove each and every element of the offense. Defendant complains the prosecution failed to present any evidence about "how this purported incident began or how it ended," where Aldana "was located in relation to [defendant] during the incident," whether Paxton was located in a place where he could observe the exchange, how Aldana "responded" to defendant's words, whether she was in sustained fear that was reasonable, and whether defendant's statements were "anything more than hyperbole." Defendant

30.

suggests Aldana's demeanor was more consistent with anger rather than sustained fear, perhaps relating to past history between defendant and Aldana, and that she allegedly took his money.

To the contrary, there is overwhelming evidence to support defendant's conviction in count I. Shortly before 5:00 a.m., defendant entered the apartment, raised the hatchet as if he was going to hit Aldana with it, and yelled at Aldana "to give him the money back or he was going to kill her." Defendant only backed away because Paxton yelled at him. He briefly raised the hatchet at Paxton, and then left the apartment and smashed the window with the hatchet. Officer Klascius spoke to Aldana just minutes after the incident. Aldana was crying, visibly upset and her hands were shaking. Aldana became distressed when Klascius was uncertain about whether defendant was being arrested. Aldana spoke in a raised tone of voice and said defendant tried to kill her with a hatchet, and she "yelled out" that she hoped they were arresting defendant "because she was afraid for her life."

There is thus substantial evidence that defendant threatened to kill Aldana while raising a hatchet with the apparent ability to strike Aldana with it, leaving her in reasonable and sustained fear that he would return to the apartment and carry out the threat.

### C. Assault with a Deadly Weapon

"Section 245, subdivision (a)(1), punishes assaults committed by the following means: 'with a deadly weapon or instrument other than a firearm,' or by 'any means of force likely to produce great bodily injury.' One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028, italics in original.) "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is

31.

no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay.… [¶] [W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required [by statute] if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.)

"As this court explained more than a century ago, 'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So, *any other similar act*, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of *using actual violence* against the person of another, will be considered an assault.' [Citations.]" (*People v. Colantuono* (1994) 7 Cal.4th 206, 219, italics added in original.)

### 1. Analysis

Defendant contends there is insufficient evidence to support his conviction for assault with a deadly weapon on Aldana because "[t]he evidence, if believed, showed that [he] held a hatchet over his head while yelling a threat. It does not show anything else. For instance, it does not indicate whether either Aldana or Paxton were armed with a weapon. [¶] Nor does it show that [defendant] had 'the present ability to commit a violent injury' on Aldana. Although Klascious [*sic*] testified that Paxton said [defendant] was holding the hatchet 'as if he was going to hit Aldana' the prosecution presented no evidence as to what that actually meant.…"

Defendant cannot reasonably argue that a hatchet is not a deadly weapon, or raising a hatchet and threatening to kill someone with it does not demonstrate his present ability to commit a violent injury upon the person he has threatened to kill. There is no evidence Aldana or Paxton were armed or provoked the incident. Indeed, Paxton said he was asleep when he heard a man yelling at Aldana and saw the man raising the hatchet as

32.

if he was going to hit Aldana. This evidence thus demonstrates that defendant was close enough to Aldana that Paxton believed he was going to hit her. Aldana obviously reached the same conclusion based on her terrified reaction and belief that he was going to kill her.[6]

## IV. PROSECUTORIAL MISCONDUCT

Defendant asserts the prosecutor committed prejudicial misconduct during closing argument when he referred to facts not in evidence, specifically whether Paxton's custodial status was the motive for failing to remember anything about the incident.

### A. Closing Argument

As noted above, Paxton testified he did not remember anything about the incident at the apartment. Paxton admitted he had prior theft convictions, and he was in custody for a probation violation. He denied that he was reluctant to testify because he was in custody.

In closing argument, the prosecutor referred to this testimony:

> "Now I want to talk a little bit about Lee Paxton's testimony. As you obviously saw his testimony primarily consisted of I don't know. I don't remember. But you have two statements here. You have his

---

[6] Defendant was also charged with count III, assault with a deadly weapon on Paxton; the jury found him not guilty of this offense. In the course of defendant's new trial motion, defense counsel speculated that defendant was found not guilty of this offense because counsel was able to cross-examine Paxton in front of the jury, whereas defendant was convicted of the two offenses against Aldana because she never appeared and was not subject to cross-examination. To the contrary, the evidence before the jury did not support count III. Aldana did not make any statements about whether defendant brandished the hatchet at Paxton. Paxton said that defendant raised the hatchet and threatened to kill Aldana, he yelled at defendant, and defendant turned toward Paxton. Paxton did not give any further details about whether defendant raised the hatchet toward him or he was simply diverted when Paxton yelled at him. In addition, Paxton's statements provided additional evidence about defendant's assault and threats against Aldana, and the record suggests the jury relied on Paxton's statements to convict defendant of the two offenses he committed against her.

33.

testimony on the stand today and then you have his prior statement to Officer Klascius.

"Now I want to offer the reasons why you should disbelieve the fact that he doesn't remember what happened and that is he has, it was obvious that he didn't want to be here. He was upset. He didn't have a choice. And the fact of the matter is that he was in custody and the people who are in custody, they are afraid of retaliation from other inmates. They are afraid of being labeled as a snitch. And those are the reasons why he said that he didn't know a response to everything.

"But the reasons why you should regard the original statement or the accurate one—"

Defense counsel objected because that was "not evidence in this trial." The court sustained the objection and immediately admonished the jury:

"The reasons why he testified the way he did, you may draw whatever conclusions you have from your own observations but the reasons you may conclude may be different than that of anybody else and there is no evidence to support, that was introduced at trial to support [the prosecutor's] perspective as to why he may not want to testify and I will just ask you to move on [referring to the prosecutor]."

The prosecutor resumed his argument and asserted Paxton's original statements were true because they were made immediately after the crime occurred, and his account was consistent with the independent evidence of defendant's possession of a hatchet, that he was using it to break the apartment window, and Aldana's statement that defendant threatened to kill her with it. There were no further objections.

### B. *Prosecutorial Misconduct*

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible

34.

methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.] Moreover, prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1203.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.) The defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

"[I]t is improper for the prosecutor to misstate either the facts or the law. [Citation.] It may also be misconduct to make reference to matters outside the record. [Citation.]" (*People v. Christensen* (2014) 229 Cal.App.4th 781, 803.) In this case, however, the jury knew that Paxton had prior felony convictions, and he was in custody for a parole violation. The jury also knew that he refused to leave his jail cell to appear in court, although Paxton claimed it was because he did not know anything about the case. The prosecutor's supposition about why he was reluctant to testify may have been a reasonable inference under the circumstances.

Even assuming the prosecutor improperly speculated about whether Paxton had a motive for failing to remember, any alleged misconduct is not prejudicial under the circumstances. Defense counsel immediately objected and the court immediately admonished the jury that the prosecutor's speculation was not supported by the trial

evidence.  Defendant argues the admonition was insufficient to address "the possibility that jurors would believe the prosecutor had information that they did not."  However, defense counsel did not object or request an additional admonition.  The prosecutor's brief statement was not of such a nature that the admonition could not "unring a bell," the prosecutor did not return to the issue, and we presume the jury followed the trial court's curative admonition.  (*People v. Mayfield* (1993) 5 Cal.4th 142, 179; *People v. Hill*, *supra*, 17 Cal.4th at p. 845.)[7]

## **DISPOSITION**

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:

_____
HILL, P.J.

_____
FRANSON, J.

---

[7] Having found defendant's appellate issues are without merit, we also reject his claim that his convictions must be reversed because of cumulative error.